UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

GENEO BROWN,

                              Plaintiff,

                                                              9:07-CV-1353
                    v.                                        (FJS/ATB)

H.D. GRAHAM, Supt., Auburn Correctional Facility;
DAWSON BROWN, Dep. Supt. of Admin., Auburn
Correctional Facility; DONALD SAWYER, Exec. Dir.,
CNY Psychiatric Center; HAROLD MEYERS, Forensic
Unit Chief; C.O. EXNER, Auburn Correctional Facility;
LT. HEAD, Auburn Correctional Facility; C. THOMAS,
C.O., Auburn Correctional Facility; SHARPLES, R.N.,
Auburn Correctional Facility; SGT. PERRY, Auburn
Correctional Facility; JOHN CULKIN, Dir., Mental Health
Services; McCARTHY, Corrections Captain,

                              Defendants.
_____

GENEO BROWN (97-A-0463), Plaintiff, *pro se*
CHRISTINA L. ROBERTS-RYBA, AAG, for the Defendants

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

    This matter was referred for Report-Recommendation by the Honorable

Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C.

§ 636(b) and Local Rules N.D.N.Y. 72.3(c).  The case was re-assigned to me on

January 4, 2010, upon the retirement of U.S. Magistrate Judge Gustave J. Di Bianco.

    In this civil rights action, plaintiff alleges numerous violations of his

constitutional and statutory rights during his confinement at Auburn Correctional

Facility ("Auburn"), in the custody of the New York Department of Correctional

Services ("DOCS").  Plaintiff  was transferred to Auburn in December 2005, after

engaging in a hunger strike at Southport Correctional Facility ("Southport").

Plaintiff contends that the mental health classification given to him by staff at

Southport was improper.  In this action, plaintiff claims that the complaints and

grievances challenging that determination, which he filed after arriving at Auburn,

were not properly addressed.  Plaintiff also asserts that his constitutional rights were

violated during 2007, when among other things, he was wrongfully denied a kosher

meal, subjected to disciplinary keeplock in violation of his due process rights,

improperly placed on restrictive confinement in response to hunger strikes, and

deprived of personal property without due process.

Presently before the court is a motion for judgment on the pleadings filed on

behalf of defendants McCarthy and Brown (Dkt. No. 67); plaintiff's motion for

summary judgment (Dkt. No. 70); and defendants' cross-motion for summary

judgment (Dkt. No. 78).[1]  For the reasons that follow, this court will recommend

denying plaintiff's motion for summary judgment, granting defendants' motion for

_____

[1]  Defendant Culkin is not a party to the motion for summary judgment.  He was not served with process until after the motions were filed, however, this decision applies equally to him.  (Dkt. No. 93).

2

summary judgment, and dismissing the amended complaint in its entirety.  Based on this determination, the motion for judgment on the pleadings filed by defendants McCarthy and Brown is moot.[2]

## **FACTS**

On December 20, 2005, plaintiff was transferred from the Special Housing Unit ("SHU") at Southport to the Auburn SHU.  (*See* Amended Complaint ("AC"), Dkt. No. 44; Transcript of Plaintiff's Deposition ("Pl. Dep.") at 12, 20, Dkt. No. 78-3).  Plaintiff remained at Auburn during the time period relevant to the claims asserted in this action, December 20, 2005 through November 9, 2007.  (*See* AC; Declaration of Harold D. Graham ("Graham Decl.") ¶ 14; and Ex. A, Dkt. No. 78-12).  Auburn houses one of the outpatient mental health satellite units operated by Central New York Psychiatric Center ("CNYPC"), the mental healthcare provider for DOCS.  (Declaration of Donald A. Sawyer ("Sawyer Decl.") ¶ 1,  Dkt. No. 78-13).

---

[2]  Defendants Brown and McCarthy claim that they are entitled to dismissal because the claims in this action are duplicative of the claims asserted against them in *Brown v. Poole*, a prior action by plaintiff pending in the Western District of New York.  (Dkt. No. 67-2 at 3).  Plaintiff argues persuasively that defendants' motion is not well-founded because the incidents which gave rise to *Brown v. Poole* occurred in February 2005, whereas the claims in this action arise out of events which occurred no earlier than November 2005.  (Dkt. No. 68 at 1-2, 7).  As plaintiff contends, "he can receive no relief from the Western District after final disposal of *Brown v. Poole* to satisfy claims in [this action]."  (*Id*. at 8).  The court would be disinclined to grant the motion for judgment on the pleadings filed on behalf of defendants Brown and McCarthy, but need not make that determination in light of the recommendation that defendants' cross-motion for summary judgment be granted and the amended complaint be dismissed in its entirety.

Included in the records accompanying plaintiff's transfer to Auburn was a "Termination Transfer Progress Note" written by Christine Antenore, a non-party employee at Southport.  (Declaration of Harold Meyers ("Meyers Decl.") ¶ 2, Dkt. No. 78-14).  This progress note stated that plaintiff had been diagnosed with "Delusional Disorder, Persecutory Type" and was in need of "OMH one (I) level services where he can be weighed once a week and more closely monitored." (Meyers Decl. Ex. A).  The progress note also reported that plaintiff had engaged in an "official hunger strike" in November 2005.[3]  On the third day of that hunger strike, plaintiff was transferred to Elmira Correctional Facility ("Elmira") where he was confined in the infirmary for ten days and then returned to Southport.  (*Id*.).[4] Plaintiff claims that he was confined at Elmira with an erroneous mental health

---

[3]  Plaintiff testified at his deposition in March 2009, that his first hunger strike was in February 2005.  (Pl. Dep. at 45).  As of the date of his deposition, plaintiff stated that he had been on "three, maybe four" hunger strikes.  (*Id*. at 45-46).  One hunger strike lasted from April 14, 2008 through August 11, 2008, during which time plaintiff was fed through a nasogastric tube and later by means of a "gastronomy tube" surgically placed in his stomach.  (*Id.  See also* Dkt. No. 38-3 at 3).

[4]  DOCS Directive 4309–Inmate Hunger Strike–sets forth the policies and procedures followed when an inmate engages in a hunger strike.  (*See* Declaration of Dawson Brown ("Brown Decl."), Ex. A, Dkt. No. 78-11).  As Deputy Superintendent of Administration at Auburn in 2007, defendant Brown served as the Hunger Strike Team Leader. (Brown Decl. ¶ 4). In his declaration, Brown provided the following summary of the protocol followed when an inmate commences a hunger strike: "I would meet with the inmate and inform him of the policy on hunger strikes.  The inmate would also be counseled by a physician regarding the physical consequences of a continued fast.  I would attempt to verify the inmate's rationale for the hunger strike.  The inmate may then be admitted to a DOCS facility infirmary by the Facility Health Services Director based on physical indications."  (Brown Decl. ¶ 5).

classification "when I suffered from no illness."  (AC at 5).  Plaintiff filed a lawsuit

in the United States District Court for the Western District of New York in which he

claims that his transfer from Southport to Elmira was illegal, that he was improperly

confined in a mental health observation cell, and that these actions were taken in

retaliation for his engaging in a hunger strike.  *See Brown v. McGinnis*, No. 1:05-

CV-0758 (W.D.N.Y.).[5]

Shortly after his arrival at Auburn, plaintiff filed a grievance regarding the

change in his mental health classification while at Southport and his transfer from

Southport to Auburn.  (AC at 4; Pl. Dep. at 22-24, &  Ex. 2, Dkt. No. 78-5).[6]

Plaintiff complained that the reasons for the status change and transfer had not been

explained to him and requested "that an appeal method be established to challenge

such administrative decision-making," that he be given a detailed explanation of the

---

[5]  Motions filed by the defendants for summary judgment are pending in *Brown v. McGinnis*.  Plaintiff has a second action pending in the Western District, *Brown v. Poole*, No. 1:05-CV-0509.  In *Poole*, plaintiff complains of his February 23, 2005 transfer from Cayuga Correctional Facility to the infirmary at Five Points Correctional Facility, in response to his hunger strike.  Defendants in *Poole* have filed motions seeking summary judgment.

[6]  The procedure established by DOCS pursuant to which an inmate may file and prosecute a grievance arising out of his confinement consists of three basic steps.  The inmate must first submit a written complaint to the Inmate Grievance Review Committee ("IGRC") at the individual facility.  If there is no informal resolution of an inmate's grievance, a hearing must take place within sixteen days after the grievance is received, and a written decision must be given to the grievant within two working days of the hearing.  The second step is an appeal of the IGRC determination to the Superintendent of the facility.  The Superintendent's ruling, in turn, may be appealed to the Central Office Review Committee ("CORC").  *See Hernandez v. Greiner*, 99 CIV. 4601, 2000 WL 520639, at *2 (S.D.N.Y. May 1, 2000).

matter, and that "his mental health level be raised to its appropriate level."  (Pl. Dep., Ex. 2).  On January 11, 2006, defendant Harold Meyers, sent a memorandum to non-party Deputy Superintendent Stallone in connection with the grievance investigation, advising that plaintiff could review his mental health records and could "discuss his concerns further with Mr. P. Ragonese and Dr. N. Hoque who currently provide OMH services on the Auburn SHU Unit."  (Pl. Dep., Ex. 2).  On January 31, 2006, the IGRC dismissed and closed the grievance.  (*Id*.).[7]

In January 2006, plaintiff filed a second grievance at Auburn regarding events which occurred in February 2005, when plaintiff engaged in a hunger strike at Cayuga Correctional Facility.  In that grievance plaintiff objected to his transfer and confinement at Five Points, as well as to what plaintiff considered to have been an "inappropriate and unauthorized mental health classification." (Pl. Dep., Ex. 3, Dkt. No. 78-6).  This grievance was denied as untimely by the IGRC.  This determination was affirmed on appeal by the Superintendent, and by the CORC.  (*Id*.).

On February 6, 2006, plaintiff wrote to defendant Harold Meyers, complaining of his "illegal transfer and detentions at Elmira and Auburn Corr, Fac. and my

---

[7]  Plaintiff challenged his classification as an OMH patient and his transfers to and detention at Elmira and Auburn by means of a state court habeas corpus petition filed in Cayuga County Supreme Court.  (AC at 5).  Plaintiff states that he sought to be "released from OMH's custody and restored back to a general SHU facility." (*Id*.).  According to plaintiff, the habeas corpus petition was dismissed in March 2006 for failure to exhaust administrative remedies. (*Id*.).

erroneous mental level classification of having a mental illness when I suffered from no illness." (AC at 5). Meyers, who served as the CNYPC Forensic Unit Chief at the Auburn satellite unit from July 2005 to May 2007, responded to plaintiff in writing on February 16, 2006. (Meyers Decl. ¶¶ 1, 4 & Ex. B). Meyers stated that "most of your concerns expressed in your letter have to do with issues at other correctional facilities." Meyers further advised plaintiff of the procedure for obtaining his mental health records and assured him that while being served by the Auburn MHU, his "mental health level will be based upon your potential clinical needs." (Id. ¶ 5 & Ex. B).[8]

Plaintiff pursued his challenges to his mental health designation through the Office of Mental Health by filing several letters of complaint and "appeals" of the determinations made at Southport regarding his mental health classification. (AC at 6). Defendant Sawyer responded by letter dated May 24, 2006, advising that an "independent review" of plaintiff's mental health classification change had been conducted by a "Cabinet level member of CNYPC staff," and that, based on the review, it had been determined that "staff followed appropriate policies and that the

---

[8] Plaintiff's mental health status was changed from Level 1 to Level 4 in March 2006. (Meyers Decl. ¶ 7 & Ex. C). While plaintiff acknowledged at his deposition that level 1 "is the most serious mental health problems" and that level 4 "is the level right before you could be removed" from mental health care, he did not consider that change to be a significant improvement because "I should've never been a 1, 2, 3 or 4. That was my whole argument." (Pl. Dep. at 42-43; see also AC at 6).

Level 1 designation is appropriate."  (Sawyer Decl. ¶ 6 & Ex.  A).

On June 2, 2007, plaintiff filed a grievance at Auburn complaining of "harassment by staff."  Plaintiff attributed this mistreatment to "political influence" by defendants Brown and McCarthy, who were named defendants in one of his pending cases, *Brown v. Poole*, 1:05-CV-0509 (W.D.N.Y.).  (AC at 8; Pl. Dep. at 46).  Plaintiff's grievance requested that an investigation be conducted into the alleged mistreatment.[9]  Plaintiff states that he was called to the mess hall to be interviewed by a corrections sergeant regarding his grievance during the morning of June 9, 2007.  (Pl. Dep. at 47).  When plaintiff returned to the mess hall for the noon meal, defendant Correctional Officer Exner told him that "[his] name had been removed off the 'Kosher' diet list and I was stealing that meal."  (AC at 9; Pl. Dep. at 48-49).[10]  C.O. Exner wrote a misbehavior report charging plaintiff with disobeying a

_____

[9]  Plaintiff testified at his deposition that "there would be verbal taunts and stuff. Sometimes individuals would try to stigmatize me as a rat or a snitch because of my court litigations . . . in order to try to stir up other inmates."  (Pl. Dep. at 48).  Plaintiff did not identify the offending officers, nor did he provide dates and locations of the harassing conduct.

[10]  Exner describes the incident somewhat differently.  Exner states that he supervised the South Mess Hall during the relevant period.  In performing his duties, Exner relied on the food services administrator and/or rabbi to provide a list on a daily basis of the inmates eligible to receive the kosher diet (referred to as the Cold Alternative Diet (CAD)).  (Exner Decl. ¶ 2). Exner states that plaintiff had been advised earlier in the day by a non-party that the rabbi had taken him off the list, but that plaintiff  took the lunch meal anyway.  When approached by Exner, plaintiff threw the meal in the trash and said "OK C.O. you got me."  (*Id.* ¶ 5).  Plaintiff disputes Exner's recitation of the relevant facts.  (Plaintiff's Response in Opposition to Cross-Motion for Summary Judgment ("Pl. Response") at 4-5, Dkt. No. 82-5).

direct order, wasting food, mess hall serving/seating violation, and property damage or loss, and placed him on keeplock status.  (AC at 9; Pl. Dep. at 49).[11]

Plaintiff commenced a hunger strike following the incident in the mess hall and, on June 12, 2007, was taken to the infirmary to have his weight and vital signs checked.  (AC at 10).  Plaintiff was told that he would have to remain in the infirmary.  He was strip searched and confined in an isolation room wearing only a smock and having just two mats to sleep on.  (*Id*.).  While in the infirmary, plaintiff was interviewed on June 13, 14, and 15 by defendants Brown and Graham and non-party Wosneski in accordance with DOCS hunger strike protocol.  (Plaintiff's Affidavit in Support of Summary Judgment ("Pl. Aff.") ¶ 30, Dkt. No. 70; Pl. Dep. at 49).  Plaintiff ended his hunger strike on June 16, 2007, when he was again offered a kosher diet.  (Pl. Aff. ¶ 32; Pl. Dep. at 49).

Defendant Lt. Raymond Head was the hearing officer designated for plaintiff's Tier II disciplinary hearing on the charges filed by C.O. Exner.  (Declaration of John F. Exner ("Exner Decl.") ¶ 4, Dkt. No. 78-15).[12]  Plaintiff states that Lt. Head visited

_____

[11]  Plaintiff filed a grievance regarding the denial of a kosher meal on July 17, 2007.  The grievance was denied as untimely and the statement of mitigating circumstances thereafter submitted by plaintiff was deemed insufficient by the IGRC.  (Pl. Dep., Ex. 4, Dkt. No. 78-7).  This determination was affirmed by the Superintendent and by the CORC.  (*Id*.).

[12]  DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions and can result in minor punishments, such as the loss of recreation privileges.  Tier II hearings involve more serious infractions and can result in penalties which

him in his infirmary isolation room on June 15, 2007, and "Lt. Head assured me that the ticket would be dismissed and there was no need for my attendance" at the hearing.  (AC at 10).  Plaintiff further alleges that he later learned that the disciplinary hearing had been conducted in his absence and that he had been found guilty of the charges and sentenced to 10 days keeplock, 14 days loss of packages - commissary - phones."  (AC at 11).  Plaintiff states the he never received the hearing disposition and had no opportunity to appeal.  (Pl. Dep. at 62-63).  According to plaintiff, "I never received a determination.  That's my issue. . . ."  (Pl. Dep. at 63).[13]

On June 29, 2007, plaintiff received legal mail from Assistant Attorney General Michael A. Siragusa.  This package contained discovery materials in *Brown v. Poole*, 1:05-CV-0509 (W.D.N.Y.) and included a videotape.  (AC at 13).  "This package was presented to me and opened in my view, by C.O. 'Thomas.'" (AC at 13;

---

include confinement for a period of time in the SHU.  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907 (1998).

[13]  Lt. Head denies telling plaintiff that he did not need to attend the hearing.  (Head Decl. ¶ 18).  Lt. Head states the hearing was conducted in plaintiff's absence because plaintiff  refused to attend.  (*Id.* ¶ 9).  Because plaintiff also refused to sign the refusal form, the form was signed and witnessed by corrections personnel and made a part of the hearing record.  (*Id.* ¶ 11).  The transcript of the disciplinary hearing is appended to Lt. Head's declaration.  (*Id.*, Ex. C).  Plaintiff also refused to acknowledge receipt of the form setting forth the hearing disposition and advising him of his appeal rights which was served on him by a non-party correction officer on June 16, 2007.  (*Id.* ¶ 16; Exner Decl. Ex. B).

Pl. Dep. at 68).[14]  Plaintiff states that the videotape was "confiscated" because he was not allowed to keep it in his cell.  Plaintiff requested that the videotape be placed in his personal property so that he could review it at a later date.  (AC at 13; Pl. Dep. at 67).  "[C.O. Thomas] said he had to confiscate it.  I said okay."  (Pl. Dep. at 68).  Plaintiff requested that C.O. Thomas give him a receipt for the videotape, but he never did.  (*Id.*).

C.O. Thomas states that after opening the legal mail in plaintiff's presence, he removed the videotape because it would have been considered contraband if it was kept in plaintiff's cell.  Thomas states that he "brought the videotape to the [SHU] cage and tagged with a note to forward to inmate brown."  (Thomas Decl. ¶ 6).

On July 1, 2007, plaintiff sent a note to the Inmate Records Coordinator asking to review the videotape.  (Thomas Decl., Ex. A).  On July 3, 2007, Sgt. Rizzo asked plaintiff if he wanted to view the videotape.  Plaintiff testified at his deposition that he declined to view the tape because he did not "feel comfortable coming out of my cell at that time with the specific officers that was working that day."  (Pl. Dep. at 71).  According to a memorandum sent by Sgt. Rizzo to Lt. Estabrook on July 3,

---

[14]  Plaintiff signed the incoming mail receipt, as required by DOCS Directive 4421–Privileged Correspondence.  (Declaration of Charles C. Thomas ("Thomas Decl.") ¶ 7 & Ex. B, Dkt. No. 78-17).

2007, plaintiff refused the offer, "stating he has already seen it."  (Thomas Decl., Ex.

A).  The memorandum goes on to state that the videotape "was sent to M.

Dushatinski in the Inmate Records office."  (*Id.*; *see* Pl. Dep. at 70).

On July 11, 2007, plaintiff filed a grievance seeking confirmation of the

whereabouts of the videotape, and reimbursement of the cost of obtaining another

copy if the tape was lost.  (AC at 13; Thomas Decl., Ex. A).  The grievance response

by the IGRC stated that the legal mail was intact and unopened when it was received

and sent to plaintiff on June 29, 2007.  (*Id.*).  Plaintiff appealed to Supt. Graham,

who upheld the IGRC and the finding that the mail had not been opened outside of

plaintiff's presence.  (*Id.*).  Plaintiff appealed to the CORC.  On September 19, 2007,

the CORC issued a decision upholding Supt. Graham's decision for the reasons

stated, advising plaintiff that the videotape was in his personal property, and stating

that all relevant information must be submitted at the time of the appeal.  (*Id.*).[15]

Plaintiff acknowledges that there is a videotape in his personal property but

alleges that "it is not the videotape confiscated on 6/29/07."  (AC at 14; Pl. Dep. at

_____

[15] Upon review of the entire grievance record it appears that plaintiff's grievance was
initially interpreted as a complaint that his legal mail had been opened outside of his presence
and that he had not been told that the videotape was enclosed.  Accordingly, the IGRC response
reflected a determination that there had not been a violation of the procedures in place for
handling privileged correspondence.  Only later did it become clear that the grievance related to
plaintiff's concern that the videotape had not been placed in his personal property, as he had
requested, and was missing.

71-72).  When asked at his deposition if he had ever requested another copy of the tape from the Attorney General, plaintiff stated that he "was not sure."  (Pl. Dep. at 68-69).

Plaintiff claims that he commenced a hunger strike on September 12, 2007, in order to "express my deep dissatisfaction for the mistreatment and dismissals of my grievances filed at I.G.R.C."  (AC at 15).  According to plaintiff's ambulatory health record for September 19, 2007, the block sergeant telephoned the infirmary to report that plaintiff had eaten dinner that evening, but continued to state that he was engaged in a hunger strike."  (Plaintiff's Exhibits in Support of Summary Judgment ("Pl. Exs.") at 111, Dkt. No. 70-3).  On September 20, 2007, plaintiff was escorted to the mental health unit for an interview from the mess hall where he had been observed eating.  (*Id*.).  Plaintiff was evaluated in the infirmary during the day on September 21, 2007.[16]  After being weighed and having his vital signs checked, plaintiff was returned to his cell.  (*Id*.; AC at 16).  Plaintiff refused the evening meal on September 21, 2007.  Later that evening, defendant Sgt. Perry asked plaintiff if he wanted to speak with someone in the infirmary about his hunger strike.  (AC at 16).

---

[16] Plaintiff alleges that the hunger strike protocol was not properly implemented on September 12, 2007 either because "security" was not recording his missed meals or because "they" failed to contact appropriate staff.  (AC at 15).  Plaintiff has not identified the staff who he claims was responsible; and he testified at his deposition that he felt fine throughout this period. (Pl. Dep. at 75-77).

Sgt. Perry escorted plaintiff to the infirmary where he spoke with defendant Richard

Sharples, RN.  (*Id*.; Declaration of Christopher Perry ("Perry Decl.") ¶ 5, Dkt. No.

78-19).  Sharples states that plaintiff threatened to commit suicide and Sharples

instructed Sgt. Perry to escort plaintiff to an isolation room under "suicide precaution

status."  (Declaration of Richard Sharples ("Sharples Decl.") ¶ 4 & Ex. A, Dkt. No.

78-18).

Plaintiff claims that he was "strip searched, given a smock to wear and 2 mats

to sleep on." (AC at 16).  On September 22, 2007, the mental health staff  "declared

[plaintiff] not to be a harm to self," but he remained confined in the isolation room

until September 26, 2007, when he was told he would return to his housing block.

(*Id*.).[17]

## **PROCEEDINGS TO DATE**

Plaintiff filed his complaint on December 28, 2007.  (Dkt. No. 1).  The

complaint named Auburn Superintendent Graham, Deputy Superintendent of

Administration Brown, CNYPC Executive Director Sawyer, CNYPC Forensic Unit

Chief  Meyers, C.O. Exner, Lt. Head, C.O. Thomas, Sharples, R.N., and Sgt. Perry,

---

[17]  Although released for return to his housing block on September 26, 2007, plaintiff
refused to leave, stating that his "hunger strike was not being acknowledged." (AC at 17).
Plaintiff further states that he refused to return to his housing unit because he was being
"assaulted and harassed by security utilizing 'sensory deprivation,' 'behavior modification,' etc.
to torture and cause harm both in S.H.U. and in general population."  (*Id*.).  This matter is not in
issue in this action.

as defendants.[18]  The defendants answered the complaint on May 23, 2008.  (Dkt. No. 23.)

Plaintiff sought an order enjoining the defendants from "use of stigmatizing mental and medical health records," directing the expungement of objectionable references from his mental health records, restoration to his requested mental health status, and barring future retaliation.  (*See* Dkt. No. 38).  Plaintiff's motion for a preliminary injunction was denied by Order of Senior District Judge Frederick J. Scullin, Jr., filed December 17, 2008.  (Dkt. No. 43).  Plaintiff's motion for leave to file an amended complaint naming John Culkin, Auburn Director of Mental Health Services, and Auburn Corrections Captain McCarthy as parties, and asserting conspiracy claims against the defendants, was granted by Judge Scullin in the December 2008 Order.  (Id. at 8).  Plaintiff's motion to amend was denied, however, insofar as plaintiff sought to assert claims "arising under the ADA and the Rehabilitation Act, and those claims are deemed stricken from the amended complaint."  (*Id*. at 8).

The amended complaint (Dkt. No. 44), as modified by Judge Scullin's Order, is the operative pleading in this action.  The original defendants answered the

---

[18]  Plaintiff was granted leave to proceed *in forma pauperis* and service of process was effected on the defendants by the U.S. Marshal.  (Dkt. No. 7).

amended complaint on December 22, 2008.  (Dkt. No. 46).  Defendant McCarthy answered the amended complaint on March 17, 2009.  (Dkt. No. 52).  An answer was filed on behalf of defendant Culkin on February 10, 2010.  (Dkt. No. 94).[19]

The parties engaged in discovery.  Plaintiff was deposed on March 27, 2009.

Defendants Brown and McCarthy filed a motion for judgment on the pleadings in August 2009.  (Dkt. No. 67).  Plaintiff responded in opposition to that motion (Dkt. No. 68), and the moving defendants replied.  (Dkt. No. 69).  A surreply submitted by plaintiff was accepted for filing.  (Dkt. No. 76).

Plaintiff filed a motion seeking summary judgment in his favor on the issues presented in the amended complaint.  (Dkt. No. 70).  Defendants responded in opposition and filed a cross-motion seeking summary judgment in their favor and dismissal of the amended complaint in its entirety.  (Dkt. No. 78).  Plaintiff responded in opposition to defendants' cross-motion.  (Dkt. No. 82, 85).

---

[19]  On May 11, 2009, plaintiff sought leave to file a second amended complaint.  (Dkt. No. 60).  By that motion, plaintiff sought to add DOCS and OMH as additional defendants and to assert ADA and Rehabilitation Act claims against them.  (Dkt. No. 60-2).  Defendants opposed the motion.  (Dkt. No. 64).  By Order of Magistrate Judge Gustave J. Di Bianco filed August 17, 2009, leave to amend was denied.  (Dkt. No. 74).  Plaintiff appealed the denial of his motion to amend to the assigned district judge.  (Dkt. No. 77).  That appeal is pending.

## DISCUSSION

I.     **Motions for Summary Judgment**

A.     **Standard of Review**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id*. However, when the moving party has met its burden, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-movant bears the burden of proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to

17

evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006) (citing *Celotex Corp.*, 477 U.S. at 323). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id*.

If the moving party satisfies its burden, the non-moving party must move forward with specific facts showing that there is a genuine issue for trial. *Id*. A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Additionally, while a court "'is not required to consider what the parties fail to point out,'" the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted).

When the parties cross-move for summary judgment, the court must draw all reasonable inferences against granting summary judgment to determine whether there are genuine issues of material fact to be tried. *Konigsberg v. Lefevre*, 267 F. Supp.

2d 255, 260 (N.D.N.Y. 2003) (citing *Continental Grain Company v. Puerto Rico Maritime Shipping Authority*, 972 F.2d 426, 429 (1st Cir. 1992)).  "If there is any genuine issue of material fact, both motions must be denied as to those issues of law; if not, one or the other party is entitled to judgment as a matter of law, and the court should render judgment."  *Konigsberg*, 267 F. Supp. 2d at 260 (citing *Thomas Publishing Company v. Division of Human Rights*, 456 F. Supp. 1104, 1108 (S.D.N.Y. 1978)).

### B.   Due Process

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States. . . ."  *West v. Atkins,* 487 U.S. 42, 48 (1988).  To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards.  *See McMenemy v. City of Rochester,* 241 F.3d 279, 285-86 (2d Cir. 2001) (property interest); *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998) (same).  Due process generally requires that a state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest.  *DiBlasio v. Novello,* 344 F.3d 292,

302 (2d Cir. 2003) (internal quotation marks omitted).[20]

### 1.    Failure to Redress Grievances and Complaints

In his "First Claim," plaintiff alleges that his constitutional rights to due process were violated by defendants Graham, Meyers, Sawyer and Culkin based upon their failure to properly investigate and redress the grievances and complaints plaintiff filed after his arrival at Auburn in December 2005, relating to the change in his mental health classification and his transfer from Southport to Auburn.  (AC at 4-8).[21]

The undisputed facts discussed above show that plaintiff filed two grievances after arriving at Auburn, complaining of the mental health designation made at Southport and his ensuing transfer to Auburn, and requesting that his mental health

---

[20]   However, the Second Circuit has recognized that "due process does not require the impossible." *DiBlasio*, 344 F.3d at 302.  Thus, intentional destruction of property by state officials during random searches of prison cells is not actionable under section 1983 if a "meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Galdamez v. Taylor*, 329 Fed.Appx. 300, 301 (2d Cir. 2009).

[21]   According to plaintiff, "DOCS and OMH have established written policies and directives regarding emergency psych transfers and for regulation of hunger strikes," which he believes were disregarded in "in lieu of unwritten policy of transferring and confining inmates such as myself to satellite or isolation units who require no treatment and this only for punitive (punishment) reasons." (AC at 7).  Thus, plaintiff contends that mental health staff at Southport improperly diagnosed him with a mental health disorder and improperly transferred him to Auburn, a level 1 mental health facility.  The individuals who made these determinations are not parties to this action.  Moreover, plaintiff's claims that those determinations were made in violation of his constitutional rights are the subject of his complaint in *Brown v. McGinnis*, which is pending in the Western District.

20

level be "raised to its appropriate level."  In his capacity as Superintendent of Auburn, defendant Graham reviewed the IGRC's disposition of the grievances and issued a determination.  (*See* Pl. Response at 2).  Superintendent Graham was named as the respondent in the state court habeas corpus proceeding filed by plaintiff to challenge his transfer to and confinement at Auburn.  (*See id*. at 3).

Plaintiff directed a letter of complaint regarding his mental health designation and transfer to Auburn to defendant Meyers.  Plaintiff acknowledges that Meyers responded in writing on February 16, 2006, but complains that Meyers failed to address his issues and, instead, advised plaintiff that his mental health level at Auburn would be based on his "clinical needs."  (Pl. Response at 3).

At his deposition, plaintiff testified that he named Sawyer as a defendant because "I wrote him a grievance and a complaint concerning my request for an investigation into the mis-classification and the transfers, and he wrote me back stating that he felt that there was no erroneous activities done."  (Pl. Dep. at 36).[22] Plaintiff admits that he had no other direct involvement with Sawyer.  (*Id*.).

_____

[22]  In his letter to plaintiff, Sawyer states that, as he advised plaintiff, "A cabinet level member of CNYPC staff conducted an independent review of the decision to change your mental health level to a Level 1.  After careful review, it was determined that staff followed appropriate policies and that the Level 1 designation is appropriate." (Sawyer Decl. ¶ 6 & Ex. A).  In his declaration, Sawyer describes his duties as Executive Director of CNYPC, which consists of a 210-bed maximum security impatient facility and 23 outpatient clinics.  (*Id*. ¶ 2).  Sawyer states that he has very little involvement with direct patient care and relies on staff to follow directives and keep him informed.  (*Id*. ¶ 3).

With respect to defendant Culkin, director of Mental Health Services for DOCS, plaintiff claims that he had been informed by subordinates of plaintiff's hunger strike and transfer to Elmira in November 2005, and was "aware" of plaintiff's transfer to Auburn by virtue of his supervisory responsibilities.  (Pl. Response at 4).  Plaintiff testified at his deposition that he had never met defendant Culkin, nor had he ever written to Culkin regarding his mental health care.  (Pl. Dep. at 86).

It is well-established that prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment.  *Rhodes v. Hoy,* No. 9:05-CV-836, 2007 WL 1343649, at *2, *6 (N.D.N.Y. May 5, 2007) (Scullin, J.) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi,* No. 01CV0285, 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) (inmate does not have a protected liberty interest in having his grievances investigated at the level of thoroughness that he desires).  Accordingly, plaintiff's allegations that the defendants failed to afford him an adequate investigation and/or failed to take appropriate remedial action in response to his

grievances and letters of complaint, provide no basis for finding liability against them pursuant to section 1983. *Cancel v. Goord,* 00 CIV. 2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to ensure that grievances are properly processed does not create a claim under section 1983).[23]

As a matter of law, the defendants had no constitutional obligation to afford plaintiff meaningful access to the internal grievance procedure, and/or to investigate and determine any such grievances or complaints in the manner he deemed appropriate. Accordingly, this court recommends dismissal of this claim against defendants Graham, Meyers, Sawyer and Culkin.

## 2.    Restrictive Confinement

Plaintiff's "Second Claim" asserts due process violations based upon a period of restricted disciplinary confinement imposed by Lt. Head in June 2007. (AC at 8-13). The "Second Claim" and the "Fourth Claim" also challenge plaintiff's confinement in the Auburn infirmary in response to his self-imposed hunger strikes

---

[23] As noted by District Judge Scullin in *Rhodes*, the fact that plaintiff does not have a constitutionally protected right to redress of his claim through the grievance procedure, does not mean that he "is without recourse to redress the alleged injuries he suffered. . . ." *Rhodes*, 2007 WL 1343649, at *2. Here, plaintiff has sought judicial review of the claims underlying his grievances and complaints in *Brown v. McGinnis*. Plaintiff may not, however, pursue a separate cause of action challenging alleged deficiencies in the grievance process with respect to the underlying claims.

in June and September of 2007.  (AC at 8-13, 15-18).

Prison discipline implicates a liberty interest when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995).  The Second Circuit has interpreted the Supreme Court's decision in *Sandin* to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin,* 515 U.S. at 484).  Atypicality in a *Sandin* inquiry is normally a question of law.  *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey,* 197 F.3d at 585.[24]  When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir. 1998); *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997).  *See also Williams v. Goord,* 111 F. Supp. 2d 280, 289 (S.D.N.Y.2000) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the

---

[24]  In cases where there is a factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution.  *Colon,* 215 F.3d at 230-31; *Sealey,* 197 F.3d at 585.

normal range of prison custody).

The duration of a disciplinary confinement, while not the only factor to be considered, remains significant under *Sandin*.  *Colon,* 215 F.3d at 231.[25]  While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not.  *Id.* at 231-32.[26]  The federal district courts in New York, applying *Sandin*, have been consistent in holding that terms of SHU or "keeplock" of approximately 30 days or less, and the related loss of privileges, do not implicate a liberty interest protected by the Due Process clause, even in the absence of detailed factual development regarding the conditions of confinement.  *See, e.g.*, *Rivera v. Goord*, 9:05-CV-1379, 2008 WL 5378372, at *2-*3 (N.D.N.Y. Dec. 22, 2008) (Sharpe, J.) (granting summary judgment on the issue that 40 days in room

---

[25]  Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. 515 U.S. at 485-86.  In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence.  *Id.* at 485.

[26]  In *Colon*, a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases.  215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

confinement did not constitute a cognizable liberty deprivation under *Sandin*) (collecting cases); *Thompson v. LaClair*, No. 9:08-CV-0037, 2009 WL 2762164, at *5-*6 (N.D.N.Y. Aug. 25, 2009) (Scullin, J.) (collecting cases); *Davidson v. Murray*, 371 F. Supp. 2d 361, 369 (W.D.N.Y. 2005).  *See also Smith v. Taylor*, 149 Fed.Appx. 12, 13 (2d Cir. 2005) (affirming grant of summary judgment dismissing plaintiff's claims of defects in an administrative hearing that resulted in 45 days of disciplinary confinement in SHU; plaintiff did not offer evidence that the conditions of his confinement were more onerous that those generally present in SHU and thus did not have a protected liberty interest in avoiding the 45-day confinement).

In this case, plaintiff was sentenced to serve ten days of keeplock confinement.[27]  This confinement, without more, is patently insufficient to state a protectable liberty interest, and plaintiff's due process claim must be denied.  *See Rodriguez v. McGinnis,* 1 F. Supp. 2d 244, 248 (S.D.N.Y. 1998) ("[T]he decisions in the Second Circuit are unanimous that keeplock . . . confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin*.") (internal quotations and citation omitted); *Crump v. Epke*, 07-CV-1331, 2010 WL 502762, at

_____

[27]  Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir. 1989).  Inmate conditions while on keeplock status are substantially the same as in the general population.  *Lee v. Coughlin,* 26 F. Supp. 2d 615, 628 (S.D.N.Y. 1998).

*14 (N.D.N.Y. Feb. 8, 2010) (plaintiff's 30 day keeplock, without more, does not state a protectable liberty interest).  Accordingly, this court finds that summary judgment dismissing plaintiff's due process claims arising out of his disciplinary confinement on this basis alone is appropriate.

The court has also considered plaintiff's claim that his confinement in an isolation cell in the Auburn infirmary for observation in response to his hunger strikes deprived him of a protected liberty interest without due process.  (Plaintiff's Brief in Support of Summary Judgment ("Pl. MOL") at 11, 32, Dkt. No. 70-1, 70-2). In *Sandin,* the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement.  *Sandin,* 515 U.S. at 479, n. 4.  Plaintiff was confined in June 2007 and again in September 2007 for periods of no more than five days.  Plaintiff states that he was given only a smock to wear and two mats to sleep on.  (AC at 10).  Plaintiff complains that he was denied other "amenities" but does not specifically identify the conditions of his confinement which he believes imposed a significant hardship.  The Auburn infirmary, however, is not a "mental hospital."  *Cabassa v. Gummerson*, 9:01-CV-1039, 2008 WL  4416411, at *11 (N.D.N.Y. Sep. 24, 2008).  Moreover, "it is difficult to characterize plaintiff's stay there as *involuntary,* since that stay was

27

caused by his choice to conduct a 'hunger strike.'" *Id.* (Cabassa's confinement in the Auburn infirmary for 101 days and 50 days SHU confinement was not "atypical and significant.").

Prison officials have the right and the duty to take measures reasonably necessary to preserve order and security within the prison and to safeguard inmates committed to their custody and care. This necessarily includes the right and duty to take reasonable measures to insure the physical and mental health of inmates engaged in hunger strikes. *Grand Jury Subpoena John Doe v. United States*, 150 F.3d 170, 172 (2d Cir. 1998) (upholding the forced feeding of an inmate engaged in a hunger strike for political and religious reasons).

The court finds that the periods of restrictive confinement experienced by plaintiff were not "atypical and significant" for purposes of *Sandin* and therefore plaintiff has failed to demonstrate the existence of a protected liberty interest. Accordingly, the court recommends that plaintiff's summary judgment motion be denied and that defendants' cross-motion for summary judgment dismissing plaintiff's due process claims arising out of his confinement in the Auburn infirmary and mental health unit be granted.

### 3.    Failure to Properly Secure Videotape

The "Third Claim" in the amended complaint addresses the alleged violation

of plaintiff's due process rights by defendant C.O. Thomas.  (AC at 13-15).  Plaintiff claims that C.O. Thomas failed to issue a receipt for the videotape that arrived in plaintiff's legal mail on June 29, 2007.  (AC at 14).  Plaintiff testified at his deposition that C.O. Thomas was sued because "he was the one that handled the tape. . . . [H]e's supposed to have given me a receipt, make sure this was logged and sent to my personal property."  (Pl. Dep. at 71).  Plaintiff seeks compensatory damages of $100 and punitive damages of $1,000.  (AC at 15).

Plaintiff has not adduced any evidence to substantiate his claim that C.O. Thomas acted improperly with respect to the videotape or that plaintiff was actually "deprived" of his property.  Plaintiff admits that C.O. Thomas brought his legal mail to him on June 29, 2007, and that Officer Thomas opened the mail in front of plaintiff and removed the videotape which, plaintiff candidly concedes, plaintiff was not permitted to keep in his cell.  C.O. Thomas' alleged wrongdoing consists only of his failure to comply with plaintiff's request that he give plaintiff a receipt evidencing that the videotape was in plaintiff's personal property.

C.O. Thomas' failure to comply with plaintiff's request for a receipt does not constitute a constitutional violation.  *See, e.g., Hourihan v. Lafferty*, 58 F. Supp. 2d 10, 15 (N.D.N.Y. 1999) (failure of seizing police officer to provide a receipt or inventory for property taken under a warrant was not a due process or other

constitutional violation within the purview of section 1983).  Moreover, there is no

record evidence that C.O. Thomas acted improperly or mishandled the videotape in

any respect.  As part of the investigation of plaintiff's grievance, C.O. Thomas

provided a memorandum in which he stated that he took the videotape to the SHU

cage on June 29, 2007, and tagged it with a note to forward to plaintiff.  (Thomas

Decl. ¶ 6).  The grievance investigation packet also includes a note dated August 23,

2007, to the effect that the videotape was in plaintiff's personal property in the

Inmate Records Center.  (Thomas Decl., Ex. A).

Indeed, although plaintiff testified at his deposition in March, 2009, that "they

claim that it's not in my property" (Pl. Dep. at 72), there is no evidence of this fact.

Even assuming, *arguendo*, that the videotape is missing (and again, there is no

credible evidence that it is), there is no basis for attributing that loss to C.O. Thomas,

who last handled the tape on June 29, 2007, and whose failure to provide a receipt to

plaintiff was clearly not the cause of any subsequent loss of the videotape.[28]  In

addition, plaintiff has not made any showing that no "meaningful postdeprivation

---

[28]  In his motion for summary judgment, plaintiff recasts his allegations and argues that
the videotape should have been delivered to the "security office" rather than to inmate records
(where he asked that it be taken) and that a "contraband" receipt should have been issued to
plaintiff.  (Pl. MOL at Dkt. No. 70-2 at 33-34).  Even if true, the fact that the videotape may have
been delivered to the wrong location does not alter the court's conclusion that plaintiff has not
established that C.O. Thomas deprived him of his property.

remedy for the loss is available."[29]

In light of the foregoing, the court finds that this claim is unsubstantiated and recommends that defendants' motion for summary judgment be granted.

## C.    Eighth Amendment

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment.  The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.* at 102.  In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Id*. at 832 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).  A viable Eighth Amendment

---

[29]  In light of this finding it is not necessary to address plaintiff's claim that Supt. Graham was responsible for the alleged wrongdoing regarding the videotape by virtue of his involvement in the grievance process.

claim must contain both an objective and a subjective component.  *Farmer*, 511 U.S. at 834.

### 1.    Conditions of confinement

In order to state a valid conditions-of-confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference."  *Wilson v. Seiter,* 501 U.S. 294, 297-99 (1991) (cited in *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir. 1996)).  To satisfy the objective element, the plaintiff must demonstrate that the conditions under which he or she was confined resulted "in unquestioned and serious deprivations of basic human needs."  *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985) (*citing Rhodes*, 452 U.S. at 347).  The Eighth Amendment is implicated for example, "when inmates are denied 'essential food, medical care, or sanitation," or when conditions are such that the threat of violence among inmates is increased." *Morgan v. Ward*, 699 F. Supp. 1025, 1054 (N.D.N.Y. 1988) (conditions of confinement in Clinton SHU did not violate Eighth Amendment).

Conditions of confinement are not cruel and unusual for Eight Amendment purposes simply because they are "restrictive and even harsh."  *Anderson*, 757 F.2d at 35.  Rather, many unpleasant aspects of prison life "are part of the penalty that

criminal offenders pay for their offenses against society." *Id*. (citation omitted).

Thus, an inmate who claimed that he was deprived "of his belt, shoe laces, and

personal property for seven days, subjected to 24-hour observation, placed with

mentally ill inmates, denied a change of 'Greens,' and otherwise subjected to the

regulations governing inmates in the MHU" did not establish an objectively serious

deprivation. *Salahuddin v. Dalsheim*, 94 CIV. 8730, 1996 WL 384898, at *14

(S.D.N.Y. Jul. 9, 1996). Significantly, the plaintiff in *Salahuddin* did not have a

mental health designation which would have supported his confinement in the mental

health unit. *Salahuddin*, 1996 WL 384898, at *3.

In this case, plaintiff complains that he was deprived of certain amenities

during his five-day confinement in an isolation cell in the Auburn infirmary on

suicide precaution in September 2007. However, nothing in the record supports a

finding that these conditions were, objectively, serious in a constitutional sense.[30]

The record is also devoid of evidence which even suggests that any defendant acted

with "deliberate indifference" toward plaintiff's physical and mental health needs in

response to his self-declared hunger strikes. As R.N. Sharples stated in his

---

[30] The amended complaint does not assert an Eighth Amendment claims with respect to plaintiff's June 2007 confinement in the Auburn infirmary in response to his self-declared hunger strike. (*See* AC at 8-13). Nevertheless, to the extent that such a claim may reasonably be inferred, there is, again, no evidence in the record that even suggests that plaintiff was confined under conditions which demonstrate an objectively serious deprivation.

declaration, he placed plaintiff in an isolation room (with two canvas mats and a canvas gown) because he threatened to commit suicide.  (Sharples Decl. ¶¶ 4, 6). Sharples took plaintiff's threat seriously and responded to this threat in a manner consistent with his training and DOCS rules and regulations. (Sharples Decl. ¶¶ 5, 8).

### 2.   Medical Indifference

Although the Court does not read the amended complaint to assert an Eighth Amendment claim against the defendants for deliberate indifference to plaintiff's serious medical needs, plaintiff's memorandum in support of his summary judgment motion frames his Eighth Amendment claim both in terms of his conditions of confinement and in terms of medical indifference.  (*See* Pl. MOL at 30). Accordingly, the Court will examine the sufficiency of that claim.

In order to state a deliberate indifference claim under the Eighth Amendment, a plaintiff must first allege a deprivation involving a medical need which is, in objective terms, "'sufficiently serious.'"  *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson,* 501 U.S. at 298), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'."  *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).

34

To prevail on an Eighth Amendment claim, a plaintiff must also establish deliberate indifference to that condition on the part of one or more of the defendants. *Farmer,* 511 U.S. at 835-37.  Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837; *see Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000).  As the Second Circuit recently affirmed, "[a]n inmate attempting to show deliberate indifference must demonstrate that the defendants 'act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm w[ould] result.'" *Farid v. Ellen*, 593 F.3d. 233, (2d Cir. 2010), quoting *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006).

This court will assume, for purposes of the pending motions, that a hunger strike constitutes an objectively serious medical need for purposes of the Eighth Amendment.  The court finds, however, that plaintiff has failed to clearly articulate any perceived inadequacies in his medical care, or to adduce evidence that any defendant acted with deliberate indifference to his medical needs.[31]  To the contrary,

---

[31] The fact that plaintiff risked undermining his health by conducting a voluntary hunger strike undercuts his claim of deliberate indifference to serious medical needs. *See, e.g., Green v. Phillips*, 04 Civ. 10202, 2006 WL 846272, at *5 (S.D.N.Y. March 31, 2006) (noting that plaintiff

plaintiff's September 2007 ambulatory health records clearly demonstrate that his stated intentions to engage in a hunger strike were taken seriously by correctional and medical staff.  He was monitored and evaluated frequently for symptoms of a hunger strike, even in the face of reports that he was observed eating on several occasions during this period.  On September 21, 2007, believing that plaintiff had threatened to commit suicide, defendant Sharples determined that plaintiff should be confined in an isolation cell on suicide precaution status.  The fact that plaintiff denies making an expression of intended suicide is not evidence that Sharples acted with deliberate indifference.

On the basis of the foregoing, no reasonable factfinder could conclude that any defendant acted with deliberate indifference to plaintiff's serious medical needs in September 2007.[32]  Accordingly, this court recommends that plaintiff's motion for

---

chose to go on a hunger strike, which contributed to his medical problems, in ruling that plaintiff failed to allege a plausible claim for deliberate indifference to his medical needs).  *See also Amin v. County of Onondaga New York*,  5:02-CV-320 (HGM/GHL), 2006 WL 1650764, at *8 (N.D.N.Y. Jun 13, 2006) (plaintiff's non-compliance with medical advice and treatment supported summary judgment on deliberate indifference claim); *Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir. 1986) (plaintiff's history of declining treatment by prison doctors undermined his claim that they were deliberately indifferent in failing to treat his back issues).

[32]  Construing the amended complaint to allege an Eighth Amendment deliberate indifference claim with respect to plaintiff's June 2007 confinement in the Auburn infirmary, the court finds such claim to be wholly unsupported.  In this instance as well, plaintiff was taken to the infirmary in response to his hunger strike and was held in the infirmary under observation for five days, until the hunger strike ended.  There is no evidence in the record that any defendant was "deliberately indifferent" to the risk of harm posed by a hunger strike.

summary judgment be denied and that defendants motion be granted and the claims dismissed.

### D.   <u>Fourth Amendment</u>

In his "Fourth Claim," plaintiff alleges that he was strip searched on September 21, 2007, prior to his confinement in the infirmary isolation room in response to his self-declared hunger strike and suicide threat.  (AC at 16).  Plaintiff alleges that this search was "wrongful, unlawful and unprivileged" and conducted without probable cause in violation of his Fourth Amendment rights.  (AC at 16-18).

Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner.  *Frazier v. Ward*, 528 F. Supp. 80, 81 (N.D.N.Y. 1981).  "In determining whether a particular strip search is reasonable, the Court considers 'the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'"  *Miller v. Bailey,* No. 05-CV-5493, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008) (quoting *Bell v. Wolfish,* 441 U.S. 520, 559 (1979)).

Strip searches conducted without probable cause have been upheld as a reasonable security measure so long as they are related to a legitimate penological goal.  *Miller*, 2008 WL 1787692, at *9.  "However, a strip search is unconstitutional

if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish." *Miller*, 2008 WL 1787692, at *9; *see, e.g., Iqbal v. Hasty*, 490 F.3d 143, 172-73 (2d Cir. 2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino v. Patrissi*, 967 F.2d 73, 80 (2d Cir. 1992) (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir. 1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort).

Plaintiff has not adduced any evidence demonstrating that he was subjected to a strip search in connection with his confinement in the infirmary isolation room, nor does he identify the individuals who authorized or performed the search.  The entry in plaintiff's ambulatory health record for September 21, 2007 by defendant Sharples states that "suicide precautions" were started and that plaintiff was confined in isolation room 6 and provided with "2 canvas mats & canvas gown."  (Pl. Exs. at 112).  That entry also indicated that plaintiff was seen in the infirmary that evening "for threatening to commit suicide."  (*Id*.).  As Sharples stated in his declaration, "[a]s required by my training, all threats of suicide must be taken seriously.  If an inmate threatens suicide, precautions must be taken to insure the health of the

inmate."  (Sharples Decl. ¶ 5).

This court will assume, for purposes of the present motions, that plaintiff was subjected to a strip search prior to his confinement in the infirmary isolation room on "suicide precaution."  There is no allegation, let alone any proof, that a strip search was performed by a defendant in this action.  Nor is there any allegation or evidence indicating that any such search was conducted with an intent to intimidate, harass, or punish plaintiff, rather than with the intention to ensure his safety by confiscating any items which might be used to inflict self-harm.  Accordingly, the court recommends granting summary judgment with respect to the Fourth Amendment claim for an illegal strip search because plaintiff has failed to state a plausible claim upon which relief can be granted.

### E.    First Amendment and RLUIPA

Plaintiff claims that defendant C.O. Exner violated his rights under the First Amendment and Religious Land Use and Institutionalized Persons Act ("RLUIPA") when he deprived him of the kosher meal on June 9, 2007.  (AC at 12).  The First Amendment guarantees the right to the free exercise of religion.  *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."  *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v.*

*Procunier,* 417 U.S. 817, 822 (1974)).  This right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04-CV-57, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007).  The Free Exercise Clause extends "beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet. . . ." *Id.*  The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples. . . ." *Ford,* 352 F.3d at 597 (citations omitted).  Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir. 2004).

RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest.  *See* 42 U.S.C. § 2000cc-l(a).  For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith.  In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious

40

doctrine. *Pugh v. Goord,* 571 F. Supp. 2d 477, 504-05 (S.D.N.Y. 2008); *Graham v. Mahmood,* No. 05-10071, 2008 WL 1849167, at *14 (S.D.N.Y. Apr. 22, 2008).

In this case, plaintiff has attested to the sincerity of his religious beliefs and to the fact that he had received the kosher diet for several years prior to this incident. However, plaintiff has not put forth any evidence demonstrating that the withholding of the kosher meal on June 15, 2007 was wrongful; *i.e.*, that the rabbi or other authorized official had not removed his name from the list, as C.O. Exner understood.

However, for purposes of these motions, the court has assumed that plaintiff was approved to receive a kosher meal throughout his confinement at Auburn. Nonetheless, the withholding of a single noon meal constituted, at most, a *de minimis* burden on plaintiff's religious expression. *See, e.g., Evans v. Albany Cty. Corr. Fac.*, 05-CV-1400, 2009 WL 1401645, at *8 (N.D.N.Y. May 14, 2009) (receipt of "wrong meals" approximately 18 out of 354 times is *de minimis* and not actionable under First Amendment); *Ward v. Goord*, No. 9:06-CV-1429, 2009 WL 102928, at *9 (N.D.N.Y. Jan. 13, 2009) ("The failure to provide a single meal is insufficient to allege a constitutional violation."); *Odom v. Dixion,* 04-CV-0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb.15, 2008) (failure to provide inmate kosher meals on 7 out of 33 occasions not sufficient under First Amendment or RLUIPA); *Thomas v. Picio,*

04-CV-3174, 2008 WL 820740, at *6 & n. 8 (S.D.N.Y. Mar. 26, 2008) (assuming that inmate plaintiff was denied three or four Kosher meals for one or two consecutive days, "such a denial is not a substantial burden" on her free exercise of religion).  *See also Norwood v. Strada*, 249 Fed. Appx. 269, 272 & n. 1 (3d Cir. 2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-one half-day emergency lock-down, was "a mere *de minimis* intrusion" that failed to substantially burden the inmate's religious beliefs).  C*f. Ford v. McGinnis,* 352 F.3d 582, 594 n. 12 (2d Cir. 2003) (whether an inmate's religious beliefs were burdened by a prison's refusal to serve a meal for the Eid ul Fitr feast was a question of fact, but noting that the "feast is sufficiently unique in its importance within Islam to distinguish the present case from those in which the mere inability to provide a small number of meals commensurate with a prisoner's religious dietary restrictions was found to be a *de minimis* burden").

Based upon the foregoing, the court finds even assuming that the withholding of the kosher meal by C.O. Exner on June 9, 2007, was wrongful, any burden imposed on plaintiff's right to religious expression was *de minimis* and fails to state a cognizable claim under either the First Amendment or RLUIPA.[33]  Accordingly, the

_____

[33]  While plaintiff did not receive a kosher meal again until June 15, 2007, the withholding of those meals cannot be attributed to C.O. Exner, because plaintiff had declared a hunger strike and, moreover, had informed DSA Brown that he was on a hunger strike because

court recommends that plaintiff's motion for summary judgment be denied and that defendants' motion be granted.

**F.    <u>Retaliation</u>**

The four "Claims" asserted in the amended complaint include allegations that defendants retaliated against plaintiff for having exercised his constitutional rights. In order to establish a claim of retaliation, a plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)). The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)). Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct.

---

he wanted a transfer, without mention of his religious concerns about his diet. (*See* Brown Decl. Ex. B.)

*Bennett*, 343 F.3d at 137.

It is well recognized that the filing of grievances and lawsuits is protected conduct, and can therefore satisfy the first prong of a retaliation claim. *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). Plaintiff has therefore sufficiently alleged that he engaged in constitutionally protected conduct with respect to his retaliation claims predicated upon his grievance and/or litigation activity.

It is questionable whether plaintiff could sustain an argument that his hunger strikes in the prison setting reflected constitutionally protected speech. A hunger strike might be protected by the First Amendment if it was intended to convey a particularized message. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989) (discussing various other non-verbal forms of communication that may constitute protected speech). However, provided that reasonable and effective means of communication remain open to inmates, and no discrimination in terms of content is involved, prison officials are accorded latitude in fashioning restrictions on the time, place and manner of communications by inmates. *Stefanoff v. Hays County, Texas*, 154 F.3d 523, 527 (5th Cir. 1998). Such restrictions must be reasonably related to legitimate penological interests. *Id.* Nonetheless, the court will assume, for the purposes of these motions, that a hunger strike is protected activity in the context of a retaliation claim. *See Green v. Phillips*, No. 04 Civ. 10202, 2006 WL 846272, at *3 (S.D.N.Y.

Mar. 31, 2006) (assuming for the sake of argument that retaliation against an inmate

for participation in a hunger strike could state a claim).[34]

The Second Circuit has defined "adverse action" in the prison context, as

"retaliatory conduct 'that would deter a similarly situated individual of ordinary

firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d

379, 381 (2d Cir. 2004) (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)

(omission in original).  This objective test applies even if the plaintiff was not

himself subjectively deterred from exercising his rights.  *Id.*

### 1.    Defendants Graham, Meyers, Sawyer, and Culkin

Plaintiff alleges that Defendants Graham, Meyers, Sawyer, and Culkin, failed

to redress the concerns plaintiff expressed to them regarding his mental health

designation and transfer to Auburn.  He claims the defendants refused to take

appropriate action in retaliation for plaintiff's filing of grievances and complaints to

which they responded.  (AC at 7-8).

Plaintiff has not adduced any factual support for his conclusory allegation that

these defendants acted or failed to act on the basis of retaliatory animus towards

plaintiff due to his prior protected conduct.  As discussed above, defendants Graham,

---

[34] As discussed below, the uncertain nature of the rights of inmates relating to hunger strikes will support the claim of certain defendants to qualified immunity.  *See Stefanoff*, 154 F.3d at 527.

Meyers, and Sawyer responded to grievances and letters of complaint filed by plaintiff in the regular course of discharging their respective duties and obligations, and on the basis of objective information available to them.  (Graham Decl. ¶¶ 12-13; Meyers Decl. ¶¶ 4-6; Sawyer Decl. ¶¶ 4-60).  With respect to defendant Culkin, plaintiff testified at his deposition that he had never written to Culkin and has not identified the conduct of this defendant of which he complains.  (See Pl. Dep. at 85-86).  There is no plausible support in the record for plaintiff's bald claims that these defendants acted with a retaliatory motive.

## 2.    Defendants Brown and McCarthy

Plaintiff claims that defendants Brown and McCarthy subjected him to restrictive confinement in the Auburn infirmary in retaliation for his engaging in hunger strikes and for naming them as defendants in *Brown v. Poole*.  (Plaintiff's Memorandum of Law in Opposition to Defendants' Cross Motion ("Pl. MOL in Opp.") at 7-8, Dkt No. 82-6).  As discussed below, to the extent the actions of these defendants were allegedly motivated by plaintiff's hunger strike, they are protected by qualified immunity because their responses were objectively reasonable and because the law was unsettled about the extent to which engaging in a hunger strike in the prison setting is subject to constitutional protection.  The court also find that plaintiff's retaliation claims against defendants Brown and McCarthy, whether based

upon his hunger strike or his litigation against them in *Brown v. Poole*, cannot otherwise be sustained.

DSA Brown's involvement with the matters complained of by plaintiff was quite limited.  As Deputy Superintendent of Administration of Auburn during 2007, Brown served as the Hunger Strike Team Leader and, when necessary, he followed the Inmate Hunger Strike Directive.  (Brown Decl. ¶¶ 2, 4).  In accordance with the hunger strike protocol, Brown met with plaintiff on June 13, 2007 and completed a Hunger Strike Interview Form.  (Brown Decl. Ex. B).  In that interview, plaintiff told Brown that he was "not eating because I want a transfer."  (*Id.*).[35]  Brown interviewed plaintiff again on June 15, 2007; plaintiff again indicated that he wanted a transfer.   (*Id.*).  DSA Brown advised plaintiff that "both mental health and the medical department are keeping a close eye on him" during his hunger strike.  (*Id.* Ex. C.)  Brown states in his declaration that he "did not personally monitor the plaintiff while he was in the infirmary."  (Brown Decl. ¶ 10).  With respect to plaintiff's September 2007 hunger strike, DSA Brown stated in his declaration that plaintiff "called off the [hunger] strike before an official hunger strike document was

---

[35]  The form asks whether the inmates is not eating because he or she is not hungry; because he or she wants a transfer; because of religious reasons; or because of the food.  (Brown Decl. Ex. B).  The "Explanation" section was completed by DSA Brown, reflecting plaintiff's statement that "I feel like I'm threatened in this facility."  (*Id*).

completed." (*Id.* ¶ 9 & Ex. D).  Based upon the established record, no reasonable factfinder could conclude that defendant Brown took "adverse action" against plaintiff for purposes of establishing a First Amendment retaliation claim, or that any actions taken by him were based upon a retaliatory animus.

Plaintiff has failed to substantiate his claim that defendant McCarthy was personally involved in the decisions to confine him in the Auburn infirmary or that he otherwise took adverse action against plaintiff with respect to the conditions of that confinement.[36]  McCarthy states in his declaration that he had no personal involvement with the matters complained of by plaintiff; he does not recall that plaintiff ever spoke to him "about his concerns nor did he write a letter directed to me.  Furthermore, I was not working on September 21, 2007 which is the date the plaintiff was placed on suicide prevention status by medical staff."  (Declaration of Timothy McCarthy ¶ 5, Dkt. No. 78-20).

Based on these facts, the court recommends the dismissal of plaintiff's conclusory retaliation claims against defendants Brown and McCarthy.

### 3.     Defendants Exner and Head

Plaintiff claims that defendant C.O. Exner denied him a kosher meal and

---

[36]  Personal involvement is a prerequisite to the assessment of damages in a section 1983 case.  *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994).

issued a misbehavior report against him in retaliation for his having filed a grievance complaining of harassment by Auburn staff.  (AC at 12; Pl. MOL at 29-30).

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007).  Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion.  Retaliatory animus ordinarily must be established circumstantially, since direct evidence of such motivation is typically lacking.  A plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."  *Id.*; *see also Rivera v. Goord,* 119 F. Supp. 2d 327, 339 (S.D.N.Y. 2000).

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between his protected grievance activity and the disciplinary incident involving the kosher meal, is the fact that plaintiff claims that he was interviewed that morning in the mess hall about his grievance.  (*See* Pl. Dep. at 61).  Such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report, can sometimes suffice to defeat a summary judgment motion seeking dismissal of a retaliation claim.  *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 14 (2d Cir.

1983)).  In many circumstances, however, this alone is insufficient to avoid summary

judgment.  *Williams v. Goord,* 111 F. Supp. 2d 280, 290 (S.D.N.Y. 2000) (citing

*Ayers v. Stewart,* 101 F.3d 687, (2d Cir. 1999)); *see also Ethier v. City of Cohoes,*

No. 1:02 Civ. 1584, 2006 WL 1007780, at *7 (N.D.N.Y. Apr. 18, 2006) (temporal

proximity between protected speech and adverse employment action was not alone

sufficient to demonstrate required nexus).

In this case, temporal proximity is the only fact that might give rise to a

determination by a reasonable factfinder that the misbehavior report was issued in

retaliation for plaintiff's grievance activity.  However, that link is insufficient when

considered in light of the present record.  There is no evidence that C.O. Exner was

aware of plaintiff's grievance activity or his interview that morning.  C.O. Exner

stated in his declaration that his assigned duties included supervising the South Mess

Hall and monitoring inmates during breakfast and lunch.  (Exner Decl. ¶ 2).  C.O.

Exner stated that he used a list provided by the food services administrator and/or the

rabbi to determine which inmates received a kosher meal.  (*Id*.).  On June 9, 2007,

having been advised earlier in the day that plaintiff's name had been taken off the list

by the rabbi, Exner stated that he approached plaintiff after he saw him take the

kosher meal.  (*Id*. ¶ 5).  The disciplinary charges placed against plaintiff by C.O.

Exner were sustained at the disciplinary hearing conducted by Lt. Head.

As to Lt. Head, plaintiff claims his actions in connection with the Tier II disciplinary hearing were retaliatory in nature, based upon plaintiff's protected grievance activity. This claim is wholly unsupported by any evidence in the record suggesting, let alone demonstrating that Lt. Head was aware of plaintiff's grievance activity. Lt. Head denies retaliating against plaintiff and states in his declaration that he made his disciplinary decision based upon the misbehavior report written by C.O. Exner and co-signed by Correction Officers Guido and Burt. (Head Decl. ¶ 14). Lt. Head stated further that he relied upon the documents presented at the hearing which evidenced plaintiff's refusal to attend, and the lack of any evidence or testimony tending to exonerate plaintiff. (*Id*.). Plaintiff has not proffered any evidence regarding his prior disciplinary record which would support the inference that the disciplinary finding was retaliatory in nature.

Given the totality of these circumstances, no reasonable factfinder could conclude that the actions taken by C.O. Exner and Lt. Head were prompted by retaliatory animus. Accordingly, the court recommends denial of plaintiff's motion for summary judgment and dismissal of this portion of plaintiff's retaliation claim.

### 4.   Defendants Thomas and Graham

Plaintiff alleges that C.O. Thomas failed to properly secure the videotape which arrived in his legal mail on June 29, 2007. He claims further that this act was

in retaliation for plaintiff's protected litigation activity in the Western District of New York, to which the videotape related, and for "filing grievances and facility claims." (Pl. MOL in Opp. at 7; AC at 14).

Here again, however, temporal proximity is the only link between the protected activity and the alleged retaliatory conduct. Plaintiff has not adduced any evidence that C.O. Thomas acted on the basis of a retaliatory motive. Moreover, as discussed above, plaintiff's claim that C.O. Thomas mishandled the videotape in any respect is wholly unsupported. Because Superintendent Graham had no involvement with the videotape other than to review plaintiff's grievance appeal, plaintiff's claim that the Superintendent retaliated against him is wholly conclusory and should be dismissed.

### 5. Defendants Sharples and Perry

Plaintiff's retaliation claims against defendants Sharples and Perry stem from their actions in September 2007 in response to plaintiff's self-declared hunger strike. Thus, plaintiff complains that these defendants confined him in the infirmary on suicide precaution in retaliation for expressing himself through a hunger strike. (AC at 18).

As discussed elsewhere, defendants would be protected by qualified immunity with respect to any retaliation claim based on their reasonable response to plaintiff's

hunger strikes.  Moreover, even assuming that plaintiff's confinement in the infirmary for five days constituted "adverse action" for purposes of a First Amendment retaliation claim, the court finds that Sharples has demonstrated that he placed plaintiff on suicide precaution consistent with his medical training and in response to plaintiff's threat to commit suicide.  (Sharples Decl. ¶¶ 4-7).  Sharples denies retaliating against plaintiff, and states that "I simply did my job and took the necessary precautions required when the plaintiff threatened suicide."  (Id. ¶ 7).

Sgt. Perry did nothing other than escort plaintiff to the infirmary and to the isolation cell on September 21, 2007.  (Perry Decl. ¶¶ 5-6).  Plaintiff has failed to establish that Sgt. Perry was personally involved in any alleged violation of plaintiff's constitutional rights, that he took "adverse action" against plaintiff, or that he acted with retaliatory animus.[37]

Accordingly, the court recommends denial of plaintiff's motion for summary judgment and dismissal of this portion of plaintiff's retaliation claim.

## G.   Conspiracy

The amended complaint alleges that all defendants conspired to violate

---

[37]  As noted above, in order to hold an individual liable for damages in a section 1983 action, plaintiff must allege that the individual was "personally involved" in the constitutional violation of which he complains.  Sgt. Perry is entitled to dismissal of plaintiff's claims against him for this reason as well.

53

plaintiff's constitutional rights.  (*See* AC).  Construing the facts in the light most favorable to plaintiff, he has failed to advance anything more than conclusory allegations of  conspiracy, which are inadequate to sustain any of his claims.

### 1.    Section  1983

In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement . . .; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir. 2002); *Cusamano v. Sobek,* 604 F. Supp. 2d 416, 468 (N.D.N.Y. 2009).  An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient.  *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir. 2007); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir. 1999).  Thus, plaintiffs must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted).  Conclusory, vague, and general allegations are insufficient to support a conspiracy claim.  *Ciambriello,* 292 F.3d at 325.

Plaintiff claims that defendants Graham, Meyers, Sawyer, and Culkin

conspired "to enforce an unwritten, unofficial policy or custom of transferring and confining plaintiff to a Level 1 facility, as a Level 1 Mental Patient," and to not "rectify[ ] the constitutional violation when the error was brought to their attention." (AC at 8).  However, plaintiff  fails to show specifically when, where, or how defendants came together and agreed to execute this purported policy.  Rather, plaintiff merely points to actions by individual defendants which support no inference of concerted conduct.  For example, plaintiff claims that defendant Meyers conspired with Christine Antenore, the social worker at Southport who signed the Transfer Note which reflected plaintiff's need for a Level 1 facility.  Plaintiff reaches this conclusion simply by virtue of the fact that, as the mental health unit chief at Auburn at that time, defendant Meyers would reasonably have notice of that transfer. (Pl. MOL at 27).

Plaintiff asserts further that defendant Graham "entered" the conspiracy by responding to plaintiff's grievance appeals.  (*Id*.).  Defendants Graham and Meyers are claimed to be co-conspirators because neither were persuaded by plaintiff's grievances and/or letter of complaint regarding his transfer to Auburn and the mental health status assigned to him at Auburn by mental health staff at Southport.  The fact that these officials, from multiple agencies, reached similar conclusions regarding plaintiff's transfer to Auburn is not evidence that they agreed, either expressly or

implicitly to violate plaintiff's rights.

Plaintiff also alleges that defendants Graham, Brown, McCarthy, and Exner conspired to violate his constitutional rights by transferring him to the infirmary on June 12, 2007 in response to his hunger strike.  (Pl. MOL at 32).  However, there is no evidence that C.O. Exner was involved with plaintiff in any respect after June 9, 2007.  While DSA Brown interviewed plaintiff and completed a hunger strike interview sheet, there is no evidence that he collaborated with Brown or McCarthy or, indeed, that any of them were responsible for the decision to keep plaintiff in the infirmary.

### 2.    Sections 1985 and 1986

"Section 1985 prohibits conspiracies to interfere with civil rights."  *Davila v. Secure Pharmacy Plus,* 329 F. Supp. 2d 311, 316 (D.Conn. 2004). To state a claim for relief under Section 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983); *see also Iqbal,* 490 F.3d at 176.  To demonstrate that a conspiracy existed,

"the plaintiff must prove a mutual understanding or meeting of the minds to violate [his or] her civil rights." *Salgado v. City of N.Y.,* No. 00-CV-3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (citations omitted). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176.

Section 1986 permits lawsuits against persons who refuse or neglect to aid in the prevention of the wrongs proscribed by Section 1985. Thus, without a valid claim under Section 1985, plaintiff cannot make out a claim under Section 1986. *Tavares v. City of New York*, 08 Civ. 3782, 2010 WL 234974, at *6 (S.D.N.Y Jan. 19, 2010); *Thompson v. New York*, 487 F. Supp. 212, 229 (N.D.N.Y. 1979); *Hodas v. Lindsay,* 431 F. Supp. 637, 645 (S.D.N.Y. 1977).

Here, plaintiff does not assert any facts giving rise to a conspiracy. No evidence has been proffered relating to agreements, or even communications, between the defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive plaintiff of his civil rights. As demonstrated above, plaintiff's allegations of conspiracy and are wholly conclusory and, therefore, insufficient. *See X-Men Sec., Inc. v. Pataki,* 196 F.3d 56, 71 (2d Cir. 1999). Moreover, there is no evidence that any alleged conspiracy was motivated by racial- or class-based animus. Plaintiff's claims that defendants were motivated by discriminatory intent based upon his religion (Hebrew Israelite), his status as a jailhouse lawyer, or his claimed

disability (regarded as having a mental impairment substantially limiting a major life activity–*i.e.*, eating), are without support in the record.

Accordingly, defendants' motion for summary judgment dismissing plaintiff's claims of conspiracy should be granted.

## H.    Qualified Immunity

Defendants seek summary judgment dismissing plaintiff's amended complaint on the ground of qualified immunity.  (Dkt. No. 78-21 at 27).  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002), *aff'd,* 80 Fed. Appx. 146 (2d Cir. 2003).  A government actor is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law."  *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001) (internal quotation marks omitted).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right[.]"  *Saucier v. Katz*, 533 U.S. 194, 201(2001), *modified by*

*Pearson v. Callahan*, __ U.S. __ , 129 S. Ct. 808, 818 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory."). The Court may also examine whether the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. Because this Court has concluded in this case that none of the alleged constitutional violations occurred, the Court need not address qualified immunity.

As to plaintiff's claims of retaliation based on his pursuit of hunger strikes, however, this court will explain why summary judgment should be granted in the alternative on the ground of qualified immunity. Inmates confined in DOCS facilities have access to several reasonable and effective methods for expressing their concerns about prison conditions, such as the grievance process, which this plaintiff liberally employed. In this case, plaintiff's hunger strikes did not seem designed to convey a particularized message that might suggest they were entitled to First Amendment protection. *See Texas v. Johnson*, 491 U.S. at 404.[38] Moreover, as

---

[38] In *Texas v. Johnson*, the Supreme Court decided that burning the American flag during a protest rally was expressive conduct within the protection of the First Amendment. While the Supreme Court discussed other types of non-verbal communication that might enjoy similar

noted above, prison officials are accorded significant latitude in fashioning restrictions on purported communications by inmates in forms, such as hunger strikes, that implicate legitimate penological interests. *Stefanoff v. Hays County, Texas*, 154 F.3d at 527 (prison hunger strikes are disruptive and prison officials had a legitimate penological interest in curtailing them).

The record establishes that various defendants reacted to plaintiff's hunger strikes pursuant to an established protocol that was reasonably designed to protect the health of the inmate and the security of the institution.  There is nothing in the record to suggest that the DOCS protocol for hunger strikes, generally or as applied to this plaintiff, were not reasonably related to valid penological interests.  Accordingly, the defendants who responded to plaintiff's hunger strikes acted reasonably in the face of the unsettled law in this area and are entitled to qualified immunity.  *See, e.g., Stefanoff*, 154 F.3d at 527 (granting summary judgment on qualified immunity grounds in favor of prison official who denied good time credit to inmate for engaging in a hunger strike).

---

protection, it did not address hunger strikes and certainly did **not** create settled law on the issue of whether reasonable responses to inmate hunger strikes by prison officials would violate the First Amendment. *See, e.g.*, *Stefanoff*, 154 F.3d at 527.  This court found no Second Circuit authority to suggest settled law on this issue. *See Green v. Phillips*, 2006 WL 846272, at *3 (not attempting to define the extent to which a prison hunger strike may be constitutionally protected).

## CONCLUSION

For the reasons stated above, it is hereby **RECOMMENDED** that:

1.    Defendants Brown and McCarthy's motion for judgment on the pleadings (Dkt. No. 67) be **denied as moot**; and

2.    Plaintiff's motion for summary judgment (Dkt. No. 70) be **denied**; and

3.    Defendants' cross-motion for summary judgment (Dkt. No. 78) be **granted** and the amended complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a),6(d), 72.


**Dated: March 30, 2010**

Hon. Andrew T. Baxter
U.S. Magistrate Judge

61